Good morning Judge Clement, Judge Dennis and Judge Barksdale. My name is John Fay and I represent World Fuel Svc Singapore PTE Ltd. May it please your honors, World Fuel has brought this appeal to ask this court to uphold what has been for a long, long time the underpinnings of maritime law, namely equity and fairness. These equitable principles have been the foundation of maritime law for centuries in this country and even before. And those fundamental principles arise in this case in essentially two contexts. One is the fact that those principles govern the substantive issue in the case, which is whether the plaintiff's claim was barred by latches. But they also are deeply involved in the district judge's decision about setting the deadline for when World Fuel was required to respond to that issue. In order to set the stage, if you will, because the equitable issues are so fact-intensive, I'd like to spend a few minutes just describing the context in which these issues arose. Well, maybe you can explain why you waited three weeks to arrest the vessel and why you arrested the vessel less than six hours before it was supposed to leave the port. I think that's critical to what the district judge did. So if you could explain that delay. Well, initially, normally, at least in my experience, Judge, a claimant would wait and not incur the expense, let the vessel get in port, talk to the vessel owner, try to reach some kind of settlement accommodation before the vessel is actually arrested. When we initially filed the lawsuit, we thought the vessel was going directly to a load port or a berth within the river to load. And after filing the lawsuit, we learned that that was not the case and that the vessel was going to be around for a while. My client was in discussions with the ship owner's lawyer in London who were talking about trying to resolve the case and indicated that, look, the lawyer, the London lawyer for the owner suggested that we hold off, we not take any action that may jeopardize settlement discussions. Once we learned that the vessel was going to be delayed in New Orleans and not wanting to jeopardize those discussions, my client asked me, since the lawsuit had already been filed, if we could put the record under seal so that the owner would not learn, hey, they filed a lawsuit and get aggravated by that fact and possibly jeopardize the settlement discussions. So that was the reason for the timing of when we filed the suit and also largely driving the decision on when the warrant for arrest was ultimately requested to be served. So the vessel schedule combined with my client's efforts to try to get a settlement of the claim before incurring the expense of a vessel arrest. Those are the reasons, Your Honor. I would suggest, though, that while those may have, you know, those factors were raised in the judge's mind by counsel for the ship owner, they really don't bear on the latches issue. The question of latches, of, you know, the timing of when we brought the suit, and, you know, I mean, that's one of the factors in the latches issue, but the actual timing of affecting or instructing the marshal to go out and serve the warrant, I've been doing this for 35 years, and there are many times when we withhold service until the attorney instructs the marshal to go forward. It costs a client about $1,000 a day to maintain a vessel under arrest between the insurance costs, the marshals, et cetera. So it's a costly proposition. And if an accommodation or a settlement or substitute security can be arranged before that happens, then the clients prefer that and try to do that. So I would suggest, Your Honors, that that's the reason why we wait it. There is an email in the record from the London counsel that we refer to in our papers that specifically says we're reverting with our client. You know, please don't take any adverse steps while we try to reach some kind of resolution. So there was nothing nefarious or sinister. It was simply an effort to try to get the case settled beforehand. And again, we believe that bug was put in the district judge's ear by counsel in his argument at the hearing on that Friday morning, but it really doesn't bear on the issue of bringing the suit whether that delay was excusable and whether the delay resulted in any substantive prejudice to the ship owner. Mr. Faye, in your experience in these kind of cases, do we have any kind of jurisdiction problem in the court? And in this case, the vessel has departed. Can we continue to litigate this? I don't know anybody who has raised this issue, but it occurred. There is a case, Judge Dennis, that says the court's jurisdiction establishes at the time of the filing of the suit. And at that time, we obviously, the district court did have jurisdiction, and that jurisdiction continues on even through this court. Now, the district judge's decision to vacate the arrest creates a very serious practical problem for my client in the sense that U.S. law gives suppliers of necessaries like world fuel a special lien right, a special protected right in the vessel to which it supplies bunkers. And now, with the vacating of that arrest, we've continued to got to track that vessel and hope that it comes back here. So the vacating of that arrest has resulted in a great prejudice to world fuel and its ability to recover for these unpaid bunkers. But you can still continue the litigation. You don't have to pay here to seize, to sell if you win, but you can still continue the litigation after the appeal is over. Well, we could do that. And I guess in the meantime, continue to hope that the vessel comes back here because the only way to enforce a judgment against the vessel would be to grab the vessel. And what do you do, sell it? Yes, Your Honor. Auction or something? Unless, and again, in 35 years, I have had two cases in which a vessel actually sold. The majority of my work is doing charter party disputes and cargo subrogation recoveries on behalf of cargo owners against ship owners. And in 35 years, and I don't know how many arrests or threatened arrests, there have only been two instances that I've been involved in directly where the owner of the ship did not post security for the claim, litigate the claim to resolution or settle it. And while all that is happening, you know, the security, either a letter of undertaking from its insurance company or a bond or in some cases cash, a financially upfront ship owner will post that security, litigate the issues, and the ship meanwhile is off trading. It's not, you know, it's not a big deal. That didn't happen here. For whatever reason, this owner did not put up security so that these issues could be resolved, what would be in a normal course of litigation. And again, we don't know the reasons behind Judge Engelhardt's decision, but we feel that, I mean, there was evidence that we talk about in our brief about the delay and the reason for the delay and whether there was any prejudice from the delay. You mean the delay from 2012 when the original claim was asserted? From when the bunkers were supplied, yes, Your Honor. And the gist of that, which was in the record as of the Friday morning hearing, was that the vessel had not been back to the U.S. prior to the time we arrested it. In other words, we supplied the bunkers at the end of 2012. We sought payment from the time charter of the vessel who ordered the bunkers. We got some payments on other invoices that were outstanding. But from that time in 2012 until December of 2016, that vessel had never returned to the United States. But in 2013, the original vessel owner that owed you the money for the bunkers went bankrupt and you didn't file a claim in the bankruptcy. Is that correct? Well, a correction, Your Honor. It was not the owner who ordered the vessels, I'm sorry, ordered the bunkers. It was a time charter. So the vessel owner, represented by Mr. Davis, time chartered the vessel to a company called Denmark. Under that charter party, Denmark had the obligation to buy the bunkers. It was that time charter that became insolvent. And based on World Fuel's experience in those liquidation proceedings overseas, thought that was a dry hole. They have the legal right under their contract in the U.S. law to pursue the lien against the vessel. And that's what they did. They diligently tracked the vessel. And when she came to the United States, the first opportunity they had, they perfected their lien right. If I may, to address the issue surrounding the deadline, this came up, there was a TRO to, it all started with the owner filing a motion for a TRO in the interim period before the vessel was actually arrested. The only issue that they were arguing was that the invoice had been paid. It was not until Thursday night before the Friday morning hearing that the latches issue was raised to the court and briefed, leaving us no time by the Friday morning hearing to even look at that issue. Well, he gave you several more days. Well, he gave us until 9 a.m. Monday morning. I got back to my office Friday. I called my client, got his voicemail. When he called me back, he was at the Philadelphia airport making a connection to Baltimore to serve Naval Reserve duty. My client is a commander, an operations officer with his unit, and he was unknown to me at the time of the hearing, scheduled to serve his drill duty weekend in Baltimore, Maryland this weekend. So we did what we could. I was able to talk to him a couple of times during the course of the weekend, but he did not have any time to help me with his affidavit, help me get documents. You will see in the response we filed 15 minutes after the judge issued the order that there are, there's a great deal of information that we had to synthesize, that he had to get first, synthesize, and put together in an affidavit to respond to that latches motion. The other thing that I would point out, first thing Monday morning, I was on the horn with the judge, spoke to his clerk about the situation, and while the judge did give us an additional two hours to get the brief in until 11 o'clock, it was just impossible given the amount of information. Throughout that morning, up until 159 p.m. on Monday afternoon, I emailed the judge's clerk and said, my client has the final draft and I'm going to have it back shortly to file. That was at 159. Fifteen minutes later, the judge signed the order. We think under these circumstances where the client was unavailable to provide the response, that it was frankly an abuse to give us such limited time when my guy was away on his duty for the Navy. You know, civilian employers are required to make reasonable accommodations for these reservists. We're running way over your time. Are you using up your rebuttal? I will, Your Honor, but I will leave it there and reserve my time, whatever I have left. Thank you. Thank you, sir. Good morning, Your Honor. Alan Davis, and I represent MSAS Pharesia, GMBH & Co. as the claimant for the vessel, the MVAS Pharesia. Is this claim still outstanding? As far as I'm aware, yes, Your Honor. Why don't they pay for the bunkers? Well, Your Honor, because I think the bunkers have already been paid for, in our view. The bunkers were paid for by Denmark, the charter. This was addressed in our motion for a temporary restraining order. The charter of this vessel, the one who purchased the bunkers, the one who contracted with World Fuels, sent two payments to World Fuels and followed within hours, I think, by an email saying, these payments should be attributed to this vessel, the AS Pharesia, and the extra amount should be applied to these other invoices. But that's not the basis of the district court ruling. Correct. That's been disputed. So we submitted that issue in our temporary restraining order. I thought he said on Friday morning, I can't deal with the merits, but I can deal with lashes. Exactly, Your Honor. And so we're here today not to press the issue of allocation and extinguishment of the debt on the basis of payment. We're here to press the issue, which the judge made very clear in his, in his, in his, in the hearing on January 6th. I know counsel just said that we don't know the reasons for Judge Engelhardt's decision. I can read from the transcript of the hearing. He made it very clear that if you vacated the arrest, it would be on the basis of latches and specifically on the fact that the World Fuels had not shown a legitimate reason for its delay of four-plus years in exercising its lien. From this record document 406, this is the court at the January 6th hearing. Well, I guess what I'm looking for, and we'll give you a chance to, I guess I'll have to give you a chance to do this, is the course of conduct. And again, I'm accepting for the sake of argument that it's a three-year period. The course of conduct, it seems to me that there's nothing in the record that indicates any type of attempt to pursue the claim, not so much the vessel. I mean, I realize you're asserting a claim. The lien on the vessel is security for the claim to get the claim paid. But there are certainly, this is important, there are certainly other avenues to take, even if it's just demand and negotiation and whatnot. But I need to see that there's some, I'd like to see if there's some course of conduct, even if this is a stream of communication, in that three-year period that would show that they're not on, I'm sorry, that they're on notice that the claim exists and your client is asserting the claim, even if it's a disputed claim, rather than just sitting on their rights for over three years and nothing happening. And later in the hearing, the Court specifically asked for additional briefing on the reasons for the four-year delay in asserting the claim in the U.S. He says, Mr. Fay, again, this is the Court, Mr. Fay candidly admitted that he had not had time to respond fully to the latches argument, so I want him, since I find that argument to have some appeal, I'd like to give him the opportunity to respond to it. And I asked several questions about it today, and he said he needed to look into a few things, and there might be more evidence of what his client was doing during this three-year period. It's an argument that I think might possibly carry the day in which case the arrest should be or, excuse me, the arrest would be vacated. So we do know why Judge Englehart ruled. Judge Englehart ruled because he asked for world fuels to show a course of conduct over the course of the intervening three-year period. And when he was ready to make his ruling on Monday, and he made very clear in the January 6th hearing that he would make a ruling on Monday earlier in the day, if possible, he was very clear that if he ruled, it would be on this issue of latches and unreasonable delay. We're here today because world fuel wants to relitigate questions of equity and to challenge the Court's exercise of jurisdiction to set and enforce briefing schedules and to issue Rule E-4F orders vacating arrests. There's no question that all of these issues, everything that's raised in this appeal, is committed to the sound discretion of the district court. It's an admiralty court sitting in admiralty exercising equitable authority. And so what we're left with is world fuel now saying, well, but everything that happened in the district court was unfair. He says it's unfair that I only got from until Monday to oppose a motion that was filed on Thursday. He says we waited for 21 or 24 or 26 days, depending on when you start counting, to arrest a vessel because we were saving $1,000 a day by doing it. And it's unfair that having waited that long, the judge didn't give us an extra few weeks to brief these issues. It's been represented on the transcript to the district court, and there's a record for recovery of damages that while they claimed they were saving $1,000 a day by waiting every day, the vessel was incurring $27,000 a day in losses when it was detained after it was ready to sail because it was under arrest. So if we're going to talk about equity and fairness — What was that, $27,000? Yes, Your Honor. That's the number that was offered to the district judge. As I said, there's a motion pending right now that's not on the record because it's been filed since then. I don't know the exact quantum. It was about a four-day delay. And I don't know that that $27,000 — there may have been adjustments to that. But that was a rough figure represented to the court. If we're going to talk about equity — What was it for, though? The vessel at that point was losing charter hire. It was placed off hire by its charters. It was incurring additional expenses because it was sitting in port when it was ready in all respects to sail. It was fully loaded with cargo, and it was trying to reengage in commerce. And you put that into evidence? Yes, Your Honor, we did. What was that affidavit that you're — The affidavit of Mr. Riley that was submitted 15 minutes or an hour or so after the court ruled, really, the funny thing about it is that it didn't actually address any of the court's questions. The court said during the hearing that it wanted evidence of a course of conduct. It was aware of one communication in May of 2015, one communication over three years in which they said, hey, we've got this claim against your vessel, and we're going to take whatever legal rights we have. The judge made clear in the hearing that wasn't sufficient. He wanted to see active efforts to assert the claim, to press the claim. And they said, well, Judge, we were monitoring. We've been constantly monitoring, and we're watching the vessel. We're watching it sail in and out of ports. And we're waiting until it gets to the U.S. And the judge made clear, that's not enough. I want to see a course of conduct. When Mr. Riley filed his affidavit on Monday, his affidavit only explained how it was that they were monitoring for those three years. He didn't point to a single other communication in that three-year period or to a single other step they took to try and assert their claim. So I would suggest that if Mr. Riley's affidavit had been received before the judge issued his ruling, which on the issue of timing, the extension was given until 11 o'clock that morning, the order was issued at about 2.15. So there were several hours in which there was no extension pending. The Court could have ruled at any time. But I would suggest that if the Court had seen Mr. Riley's affidavit, it only would have reaffirmed that there was no course of conduct to preserve and protect this alleged claim. Do you agree that we have jurisdiction to continue to litigate this matter even after the ship has sailed? Yes, Judge. I do think that there's appellate jurisdiction to review the order vacating the arrest. There are issues of whether it would be a useless judgment. We haven't briefed that because it just really didn't come up in the course of the briefing. I do think there are certainly issues that whether the District Court could issue any relief at this point. There's a complaint that's been made that while they were waiting because they had to wait for the vessel to return to the U.S. First of all, it's a little bit of a, it's not the right word, return to the U.S. The vessel had never been to the U.S. This delivery of bunkers was done, this was a Singapore company, World Fuels, delivering bunkers in Singapore to a Liberian vessel chartered by a German company. They weren't waiting for it to return to the U.S. They were waiting for it to come to the U.S. for the first time. It's become very fashionable for bunker suppliers to specify in their terms and conditions that U.S. law governs the issue of a maritime lane. And frankly, that's because U.S. law is the most favorable of any country in the world for a maritime lane claim for necessary suppliers. But to suggest that they were somehow prejudiced because our vessel never came to the United States when there was no reasonable expectation it would ever come to the United States is a little bit disingenuous. They've suggested that suggestion has been made that they can't be guilty of latches because they arrested the vessel the first time it pulled into a U.S. port. And the primary authority for that, and this was at page 39 of World Fuels' brief and addressed again in 14 of the reply, they cite heavily the Ryan Walsh decision, which is a District of Maryland decision, 1996, for the proposition, and it collects some cases that I'll address, that as long as we act the first time a new vessel shows up in the U.S., we can't be guilty of latches. The very next paragraph from the Ryan Walsh decision, this is at 930 Federal Supplement 210, I believe it's pages 215 and 216. The very next paragraph, which responds to the argument that they make on Ryan Walsh is, quote, according to the plaintiffs, this Court should hold as a general legal principle that the latches defense is inapplicable to maritime lane claims where a vessel is abroad continuously before she's arrested. Contrary to the plaintiff's position, however, it is clear that the question before this Court is whether, under all the circumstances, the plaintiff's delay in filing suit was reasonable. Under particular factual circumstances, it may be reasonable for a plaintiff to wait until a vessel reaches the United States before arresting that vessel, while under other circumstances it may not. The plaintiffs, therefore, cannot rely on a categorical rule. End quote. There is no rule that they get to they get at least one shot in the U.S. And I would say that if you look at the totality of circumstances here where a foreign claimant supplies bunkers in a foreign country to a foreign vessel on the instructions of a foreign charter, it's they shouldn't have any benefit of, well, we get one chance in the U.S. They've unilaterally selected U.S. law to govern because they think it's the most favorable for them. The other cases they cite for this proposition are all distinguishable. The Cote Marr decision was a arrest of a U.S. flag vessel. Both Litza, this is Bermuda v. Litza, and Ryan Walsh were claims made by U.S. stevedores. So under those circumstances, perhaps it is reasonable to say that if a company in the U.S. supplies goods to a U.S. flag vessel, maybe it's allowed one opportunity when the vessel returns to assert its lien. But I just think that the circumstances here are nothing like those cases. This is a foreign, a purely foreign transaction, and they have, it's perfectly reasonable to expect that world fuels could follow it into foreign waters to assert its claim. We've mentioned in our brief several countries, I think there were 42 opportunities that we've cited, and this is their burden at this point because of the burden shifting under Berio's, but we've mentioned, we've gone out and found, well, Singapore. Singapore, you could have asserted an interim claim against the vessel. Actually, this Court held in the Boccioliana case that a Singapore court, and this was based on expert testimony presented in that case, the Eastern District concluded and this Court affirmed on appeal that a Singapore court would apply a U.S. choice of law clause and find that clause enforceable. And that clause came out of world fuel services, exact same terms and conditions. It was the same clause here. And the Court said, well, a Singapore court would apply U.S. law. So for them to say we had to wait for the vessel to come back to the U.S. for us to assert our claim, certainly they could have asserted it in Singapore, where they're from. They had 12 opportunities to do that. They didn't. The vessel also. The vessel in Senegal or Australia? I'm sorry. Could they have? Could they have? Yes. We believe they could have. I can't speak to Senegal law specifically, but they didn't cover that at Tulane. Australia, they actually did get a warrant for arrest in Australia. They applied to the Court, and the Court issued a warrant for arrest. And then they didn't serve it. They withheld execution. And they say, well, we wanted to try and settle it. And so we held back and we didn't serve that warrant. They don't mention that when they got the warrant of arrest in Australia, it was the fourth time the vessel had been to Australia since these bunkers were supplied. So any of the three times preceding that, they also could have gotten a warrant of arrest. They didn't. So, again, we think if taking into consideration the district court's authority, its discretion, its exercise of equitable power, and the fact that the equities in this situation lie resoundingly with our client, we think absolutely the district court was correct to vacate the attachment, excuse me, the arrest, and to find that latch was applied. And I'm happy to address any other questions the Court might have. Thank you. Thank you, Your Honor. Thank you, sir. Mr. Fay. I'm sorry, Judge. It's showing me I have five minutes. I don't know how much I cut into my time last time. That probably was my fault. Mr. Fay, you go ahead and take your five minutes. Thank you, Your Honor. I should have warned you. A couple of points. The ability to arrest in any of the other jurisdictions that the shipowner mentioned in his brief, we submitted in our appendix summaries of the reasons why there is no in rem action in any of those jurisdictions and, therefore, no ability to arrest the vessel to enforce our lien rights there. As far as Australia, we did get a warrant for the arrest. At the time, there was a court decision pending that allowed it. But that decision was an aberration, we are told by Australian counsel. And the decision that allowed that arrest, upon which we relied for our arrest, was ultimately reversed on appeal. In addition, when we arrested in Australia, that's when the shipowner surfaced with statements from Denmark's former managing director and documents from Denmark explaining and describing what the payments were that Denmark had made. And those documents show that the payments were not for this invoice. But the point was, the point of me mentioning that is the counsel for the shipowner, while the vessel was in Australia, sent those documents and statements to WorldFuel and threatened WorldFuel that if they ever showed up in Germany, they were going to arrest them criminally, made all kinds of personal threats to Mr. Riley at WorldFuel. So once we were given, once WorldFuel was given the documentation from Denmark alleging that the invoice had been paid, we did not go forward with the arrest, but instead investigated whether there was any truth to that. And by the time that... Now, where are we going to find this in the record, what you're telling us? I believe, Your Honor, it's in Mr. Riley's affidavit that was submitted at 220... So it's not part of the record on appeal? It is. It is part of the record on appeal. It was filed into the record after the judge's order. It was the motion you filed with our court to try to have additional documents submitted. Yes. What motion was that? Well, that motion was primarily to try to have, before Your Honors, the e-mails that were exchanged between myself and counsel and the court in several respects. I mean, the judge, when counsel originally filed the motion for TRO on December 30th, identifying the single issue of whether the invoice had been paid, the judge invited us to respond by e-mail with a brief response so that he could get a handle on what our defense was to the motion for the TRO. So in that e-mail, those e-mails did not make it into the record either. All right. But the affidavit, even though the judge never saw it before he ruled, is in the record? Yes, it is, Your Honor. The timing of when this motion came up, again, we suggest it's very important. We were, my client, I wasn't directly involved, but my client was in direct communication with the owner's London counsel trying to reach a settlement. So the delay in actually serving the arrest warrant wasn't driven solely by the daily cost, as counsel would have Your Honors believe. The primary reason we did not serve that arrest warrant was because we were trying to get the case settled, and the e-mails in the record show that that was the case. At one point, my client asked me to get involved directly, and there's an e-mail from me to the London lawyer as late as December 26th, still trying to elicit some discussions to get the case resolved. So to suggest that this was purely a cost saving, while that is true, it was not the motivating factor here. We were trying to get the case settled, and I see my time is up. Thank you, Mr. Bates. Thank you. That concludes our arguments on these cases that were discussed.